21-3886 Consumers Research et al. v. Federal Communications Commission et al. Oral argument, 15 minutes per side. Mr. McOtter for the petitioners. May it please the Court. Troy McOtter for petitioners. And may I reserve four minutes, Your Honor? Certainly. Thank you. In a non-delegation challenge, what suffices as an intelligible principle will vary based on the nature and the scope of the power delegated. Here, Congress delegated the power to decide how much money to raise for a multibillion-dollar nationwide social program. But we know from Supreme Court decisions like NCTA, Skinner, and J.W. Hampton that when it comes to raising revenue, an intelligible principle requires some sort of objective guardrail on the executive's ability to raise money, like caps or rates. It seems to me that that's one of the keys to this case. And in looking at your briefing, I'm struggling a little bit to understand your assumption regarding this intelligible principle that you assume that it is grounded in, and I want to be careful to use your language, revenue-raising statutes like Hampton and Skinner cases. I don't fully understand your rationale, but it does appear to me that your whole argument hinges on this need to show that the case is related to revenue-raising statutes, rather than what I believe your opposing counsel and what much of the case law indicates, that this may fall into the category of complex, technical determinations such as those that were delegated in Whitman, American Power, or national broadcasting. If we disagree with your conclusion that this is a revenue-raising statute, does that resolve the case against you? I would say no, Your Honor, and the primary reason would be that this statute would still be a non-delegation violation because of the FCC's power to redefine universal service, that dual-layer delegation, which I think makes it unique even from the cases the government cites. And the only analogy I could find for that sort of dual-layer delegation, where the agency has a very broad definition and then is given the power to redefine that very broad definition, was Schechter Poultry, which we cite in our briefs, Your Honor. If I could, I would push back against the premise of Your Honor's question about the distinction in revenue-raising, because the Supreme Court in the NCTA case from 1974, that decision made the same distinction. It said that phrases like in the public policy or in the public interest or other pertinent factors, which was the language in that statute, those might fly in other non-delegation cases, but when it comes to raising revenue, that's too vague. It's not good enough. Well, see, that's exactly the distinction we're talking about. If, in fact, it's not a tax or a revenue-raising provision, then don't you fall into the general laws that cover these delegations in cases where what is being delegated grows out of a complex or more technical arena of the law. I guess my struggle is this Federal Communications Commission, what they are in fact doing lives in the world of technical details and an incredibly quickly changing arena of this world. When you think of, just take the educational example, when you began earlier in this with what we are talking about, communication being simply a telephone. And then it was a telephone with Internet. And then it was Internet connections in a school. All of those are rapid changes in the technology. Why doesn't that make a big difference in this case? So, Your Honor, to be clear, our non-delegation challenge is to the FCC's revenue-raising power. The government has agreed that the disbursement of the money, kind of how it's spent on particular very technical aspects about telecom infrastructure, that sort of thing, they've agreed that those are not relevant. And so the question is, when it comes to revenue-raising, is that a technical aspect? And our view, based on the NCTA case from the Supreme Court, is that Congress is the expert when it comes to raising money. It's not difficult at all for Congress to set some sort of objective limit. It doesn't have to be any particular form. But when it comes to revenue-raising, that's the standard kind of political legislative judgment as opposed then to spending it on one particular telecom project or another. Why is it revenue-raising as opposed to just imposing a fee? Well, so I think the distinction, again, is NCTA, Your Honor, which looks at the distinction between a fee and a tax. And the court there said when it comes to revenue-raising, if it goes anything beyond that very, very narrow definition of a fee, essentially covering the benefit to the recipient, then that raises taxing questions. It raises questions about revenue-raising. It carries the agency far from its customary orbit, is the term the court uses, and in search of revenue as if it were a house appropriations committee. Yeah, but applying that language to this situation, why isn't this a fee rather than a tax? Well, so the Supreme Court has decisions about what's a tax versus what's a fee. The money here is raised from a large group of individuals, probably millions of individuals. It gets put into a common fund. It then gets redistributed back out for the benefit of perhaps millions, hundreds of thousands maybe, of individuals. That's kind of the classic definition of a tax. And I would point in particular to the Fifth Circuit's decision in Alenco at page 621. And it has a useful statement, which is that universal service, it benefits consumers. It doesn't benefit the networks, the carriers. And so the way to think of a fee, Your Honor, would be that, for example, one of these networks, one of these phone carriers would ask the FCC for a license. They have to pay a certain amount of money for the FCC to process that and review everything. The company will get some benefit from it. There, the carrier, the telecom company, is the beneficiary. That's what makes it a fee. When it then, in this case, is being used to benefit consumers rather than the carriers, that's what makes it a tax. In fact, I would say that the revenue collected here is even more of a tax than things that people might normally consider to be a tax, like Social Security. Social Security, for example, is money that, at least on paper, an individual puts in and then is supposed to collect their own money afterwards. Here, the money goes up. Now we're getting a little bit off course here. This fourth quarter contribution factor notice about the fee that has to be paid, one argument is that it's not a final order but just applies the regulatory scheme and then doesn't create a legal obligation. The legal obligation comes from the passage of Section 254, and so the contribution factor document just provides another instance of providing ongoing notice. It's really like an invoice, so to speak. What's wrong with that argument? The Hobbs Act gives this court jurisdiction over any order of the FCC that aggrieves the petitioners. The government has never challenged there is a final order under Section 402, 47 U.S.C. 402A, and the reason I think they haven't done that is the Supreme Court held in Columbia Broadcasting, 1942, that what counts as a final order that would then fall under the Hobbs Act is extremely broad. Well, the problem is you need to take, arguably, you need to take your beef to the FCC, and when the FCC finally determines the issue, appeal that to the Court of Appeals. Here, there's just this contribution factor, fourth quarter contribution factor notice document, and you're trying to skip the FCC and go right to the Court of Appeals here, and it would seem that the FCC should have an opportunity to rule on this before you get to the Court of Appeals. We did file a comment, Your Honor, before the FCC's order went final in this case, raising all the same arguments. Now, the FCC itself sets up this very narrow window of only 14 days between when the proposal is issued and when it becomes final binding. And did you file a comment in that 14-day period? We did, Your Honor. It is a 14-day period. It's short. Yeah, and what did the comment do? Did the comment challenge the actual computation here, or did the comment go to the underlying power to have this USAC system that's been in effect for more than a decade? It challenged the agency's constitutional authority, Your Honor. So your theory is then that every time a quarterly payment is required, that you can go back to the beginnings and challenge the constitutionality of the approach? Yes, we can challenge the constitutionality of an agency's application of a statute, Your Honor. I think one of the big misunderstandings that the government has in its argument about the timing and the court's jurisdiction is that our core non-delegation challenge is not to some old regulations from 25 years ago. It's to a statute, and there's no timeline for challenging final agency action applying a statute. And, in fact, under Whitman, we have to be challenging the statute because an agency's regulations are irrelevant for a non-delegation challenge. And, Your Honor, I would also point to another one of the government's, in our view, mistakes about this. They argue that it's, therefore, a facial challenge or not an as-applied challenge. But this court's case law, HERR, H-E-R-R, Lease Be Clear Channel, the Arctic Express cases, the distinction they make is not facial versus as-applied.  The distinction is whether you're challenging the agency's statutory or constitutional authority or whether you're raising a procedural challenge to the promulgation of the rule. We're certainly not raising the latter kind of argument, which would be like a notice and comment or logical outgrowth type argument. We're raising a challenge to the constitutional authority of the agency to take the admittedly final action here, Your Honor. I think it would be very unusual if we then had to wait until the private entity USAC issues a bill afterwards. There's a final government order here. The Hobbs Act gives this court jurisdiction if we bring a challenge within 60 days to that order. And the constitutional authority of an agency to act is always relevant. It's always an issue that the agency should decide and that the court would then have jurisdiction to review itself. I see my time. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the court, my name is James Carr, and I represent the Federal Communications Commission in the United States. I'd like to begin with a discussion of the revenue-raising, the tax versus fee issue. We think that's a red herring because the Supreme Court has made quite clear that for purposes of non-delegation, there's not a special test for delegations of tax authority. The Skinner case, a unanimous Supreme Court decision in 1989, made that clear. I would also argue that the NCTA case, on which petitioners heavily rely, really doesn't seem particularly relevant here. For one thing, it's not a non-delegation case. The court in that case made it very clear, and it's probably the clearest thing in what is a rather opaque opinion, the court made it very clear that it wasn't reaching the issue of non-delegation there. It then later said that it was going to remand the issue to the commission about whether the particular fee it was charging was in line with the statutory language. The Supreme Court in Skinner described NCTA as being much narrower than petitioners are representing it here. They said in Skinner that NCTA stood for the proposition that when there's a delegation, Congress must indicate clearly its intention to delegate to the executive discretionary authority to impose additional financial burdens on regulated entities, whether they're characterized as fees or taxes. So in the Skinner court's view, it really didn't much matter whether these things were fees or taxes. Because the assumption there is that the same intelligible principle governs. Precisely. No matter which it is. And Skinner was what, 89? Skinner was an 89 decision. And NCTA was 74? That's correct. Yes, Your Honor. The key point is that the intelligible principle test applies across the board to all delegations. Now, petitioners make the argument that, of course, you might have different intelligible principles depending on the scope of what is being delegated. And in particular, they rely on the Whitman decision for that. I'd like to take a look at that decision in particular. Justice Scalia's opinion for the court in Whitman says it is true enough that the degree of agency discretion that is acceptable varies according to the scope of the power congressionally conferred. Petitioners read that as meaning that, well, when you have a revenue-raising delegation, you have to have some sort of quantitative limit, whether it's a hard cap, a formula, a percentage. Justice Scalia, writing for the court, rejected that premise outright. Because later in the same paragraph, he says, but even in the sweeping regulatory schemes we have never demanded, as the Court of Appeals did in that case, that statutes provide a, quote, determinate criterion, end quote, for saying how much is too much. That language, determinate criterion, was taken from the D.C. Circuit opinion that the Supreme Court overruled in Whitman. And Justice Scalia went on to give a particular example of a revenue-raising delegation, in fact, what is arguably a taxing delegation, that did not include a quantitative limit. He referred to the Lichter decision, Lichter v. United States in 1948. That case involved a statute which authorized agencies to recoup excessive profits that were made from wartime government contracts. And Justice Scalia says about that statute, the statute at issue in Lichter, authorized agencies to recoup excess profits paid under wartime government contracts, yet we, the Supreme Court, did not insist that Congress specify how much profit was too much. If you go back to the Lichter decision, it makes it clear that there was no need to specify, well, is there a particular amount, is there a particular percentage? It's left to the judgment of the agencies and the thinking of the Supreme Court in that decision was that in context, the term excessive profits was clear enough to give a reasonable, intelligible principle, and that you did not need a specific number. But based on Skinner, you think that the usage or the purpose of the act really does not play a role? The complexity, the technical nature of it, or does that have a role in this case? Well, it does have a role in this case, Your Honor. I think my only point in discussing Skinner and Whitman and Lichter as well is just that the premise that petitioners have staked out, that somehow there has to be a numerical cap, is simply not correct. And petitioners, if you look at their briefs, they have not cited a single case where the Supreme Court has said that a revenue raising delegation is constitutional only because there is a numerical cap. I mean, it's not been decisive or definitive. And as Justice Scalia points out in Whitman, the Court has never insisted on a numerical criteria. So what are the limits here? The one limit, if you look at Section 254D, which we've laid out the relevant sections in the appendix of our brief, but Section 254D specifies that carriers that provide interstate telecommunications service are required to contribute, quote, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. So that last phrase, to preserve and advance universal service, that's a limiting principle. The Commission cannot raise this money and spend it on something else. It's limited to that particular statutory goal. And the D.C. Circuit, rather, in 2012, in the Rural Cellular II case, reviewing and rejecting a non-delegation challenge to this very statute, said that that language, to preserve and advance universal service, was sufficient to satisfy the Constitution. Does it matter that the remainder of those sections from E and D, for example, also have specific directives regarding how the money is used and who gets discounts and how you calculate what has to be paid? Well, it absolutely matters that the rest of the statute provides context for what is meant by universal service. Section 254B has a whole list of principles that the Commission must consider when it establishes universal service policies. And by the way, those principles have been interpreted. This notion that somehow the Commission is unaccountable and it can do whatever it wants under this statute is simply not true. What about the feature that 254B ends with additional principles, such additional principles are necessary and appropriate for the protection of the public interest, convenience and necessity? It seems like it's giving virtually untrammeled power. It might seem that way, Your Honor, but for one thing, the Commission couldn't do it alone. It's got to do it in conjunction with the Joint Board. That provision includes the Joint Board as well, which includes federal and state commissions. Does that strengthen your position or weaken it, that some other board other than the FCC is involved, which is this Joint Board with state as well as federal? Well, the Joint Board has to make a recommendation before the FCC even adopts a new principle. So I would say that strengthens our position in terms of just the restraints on the Commission's discretion to proceed here. I think it's also important to remember when courts are reading the term public interest in these regulatory statutes, they have to look to the broader context, and the Supreme Court said that in NAACP versus Federal Power Commission in 1975 case, which we've cited in our brief. Here, the public interest, again, and it's got to be consistent with the rest of the Act. So the Commission can't define universal services somehow far outside the scope of what's going on with this statute. The universal service program was in existence before the 1996 Act was passed. There were a couple of universal service programs designed to fund service in high-cost areas and service to low-income consumers. So Congress was not writing on a blank slate here. It understood what was going on, and a lot of the principles are principles that the Commission has been applying for some time. Do you agree that this is a timely suit under the Hobbs Act? Your Honor, we don't think it's timely because we believe that there is meaning in this term, as applied challenge. It's obvious that these petitioners can't challenge the original adoption of these rules. They were adopted decades ago. There is a doctrine known as functional music. The D.C. Circuit adopted it back in the 1950s, and this Court has adopted it as well, which indicates that when a particular rule is applied to a particular party, that party can then bring suit and challenge the constitutional or statutory authority of the Commission to adopt the rule in the first place. So that restarts the 60-day clock. We don't think this is timely because we don't think the announcement of the contribution factor actually applies this to any regulated entity. The contribution factor isn't actually applied to any of these petitioners until USAC takes it, makes the calculation, and then sends out bills or invoices to particular carriers saying, this is what you owe. So it's premature. It is premature, exactly. That is what we believe. And so that's why we met. And this is a jurisdictional argument. We felt an obligation to raise this argument because it is a jurisdictional argument. I'd like to turn briefly to the challenge to USAC and the subdelegation. I think the petitioners fundamentally misunderstand USAC's role in this whole process. If you look at 54.702C of the Commission's rules, it makes clear that USAC has no policymaking or rulemaking authority. The Commission makes all the policy decisions in this area. USAC's function is to provide administrative support, billing, collection, disbursement. Now, in the contribution factor area, it is providing projections of future needs to the Commission. But those projections are informed by detailed and specific rules and instructions within the Commission's regulations. And we cite all those regulations on page 10 of our brief. There are four different universal service mechanisms. Each one of them has particular requirements regarding who is eligible, what they have to do to become eligible, how much they're entitled to receive, and there are formulas for calculating the different subsidies that they would be required to receive. USAC's projections are all based on those rules. And that's the reason why the Commission hasn't seen the need over the years to question USAC's projections. But of course, if later on the Commission found that USAC had erred in some way or had deviated from the Commission's rules, either through an appeal from an aggrieved carrier who said, I disagree with USAC's decision, brought it to the Commission, and the Commission could reverse USAC in that circumstance. And there are annual audits of USAC which are reviewed by the Commission, and if there is any indication that USAC is not completely adhering to FCC rules, the Commission directs them to change their policy. So your opponent mentioned the 14-day period for people such as themselves to make comments. How long does the FCC have to evaluate what USAC has done? Well, let me say first that the 14-day period didn't really, comments were not solicited. There was a public notice that this is what the Commission proposes as the contribution factor. It will have 14 days to change its mind. The Commission has 14 days. To the best of my knowledge, the comments filed by these petitioners on the 13th day of the 14-day period were the first that Commission staff had ever seen in 25 years of this program. I'm sorry, Your Honor, I just wanted to get back to your question. You said how much time does the Commission have with this? So there is additional time for the Commission and its staff to review. So there is enough time, in other words, because 14 days would seem like a short time for the FCC to be able to evaluate this formula, because it does look like a very complicated formula. It is, and it's not just 14 days. The Commission gets the projections 60 days beforehand. I think it's also important to note that USAC and Commission staff are in constant contact about various issues, including budgeting issues, and so these projections don't happen in a vacuum. Who appoints the USAC members? The Board of Directors is, I believe, approved by the FCC chair. But it's based on submissions. USAC's board consists of representatives of various interest groups, some of them from the industry, some of them from recipients of subsidies, schools and libraries, some of them from consumer groups, some of them from state commissions. Anyway, there are a wide range of interests, and those groups nominate particular individuals to serve on USAC. And the Board of Directors nominates a particular individual to serve on the USAC's board. That's laid out, I believe, in, I think it's 54.703, which is one of the regulations we've attached to our brief. I see that my time is up, so I would just urge the Court to reject the petitioner's petition for review. Thank you very much. Thank you. So what about the ripeness challenge? So, Your Honor, I would respectfully point you to our reply brief, pages 13 to 15, where we address those arguments. The argument from the FCC is that we have to wait for a USAC bill, but the discourse decision in HERR, H-E-R-R, said that a party does not have to wait for application to that specific party in order to raise the challenge. And I think it would be especially unusual to say in this case that we would not just have to wait for the application of essentially a bill, but then that bill comes from a private party. So we have a final government order from the commission under Section 402A. The Hobbs Act gives this Court jurisdiction over that final order. That alone is enough. There's no need, then, to have to wait for a private party bill. In fact, the Supreme Court said in Free Enterprise that a party doesn't have to essentially violate the obligation in order to bring their challenge first. I'd also point out, as we do in our reply brief, Your Honor, that some petitioners do not receive USAC bills. They're just regular consumers who pay this amount. So they don't have a mechanism to challenge through USAC. The government's never challenged their standing, however, never argued they haven't been injured or don't have a causal link from the final FCC order. And some of your petitioners are specific individual consumers, is that right? Yes, Your Honor. It's a mix of individual consumers, and then in particular there's one, what they call an MVNO, essentially a reseller of telephone service. So we tried to cover both ends on that. But the private individuals have no USAC mechanism. I'd also like to go back to the NCTA 1974 case, since it's come up quite a bit. As we read that case, it's really a constitutional avoidance decision. What the Court says is that if the agency's charging a true fee, that very minimal amount, just to cover the benefit to the recipient, then that would be allowed under non-delegation principles. And I would dispute, my friend, on the other side's characterization of NCTA as not being about delegation. The Court in NCTA cites J.W. Hampton. It cites Schechter Poultry. It talks about the fact that the taxing power is uniquely a legislative power, and that if an agency had that sort of power to raise money beyond just that bare minimum fee, that that would raise the specter of an unconstitutional delegation. So we do read NCTA as noting this key distinction about agencies having the power to raise money generally, and saying, in that case, they could interpret the statute narrowly to avoid it. In our case... Because it says that this same intelligible principle applies, whether it's revenue-raising or delegates power in a more technocratic way, doesn't Skinner, which was what 15 years later, respond to your argument? And isn't that the governing law? A few points, Your Honor. So Skinner favorably cites NCTA. There's no indication that it's narrowing or cabineting it. Our interpretation of Skinner is that it's rejecting two things. First, the notion that some legislative powers just cannot be delegated, period. And second, that some legislative powers would be subject to a much stricter test. And we aren't disputing either of those, setting aside our kind of original argument that we're preserving. We aren't disputing either of those. The point is simply that Skinner kind of readopted NCTA's point about revenue-raising and the fact that there needs to be some sort of particular objective limitation. And the evidence for that in Skinner is when the court cites the 105% cap. The agency was limited to raising 105% of the amount Congress had appropriated already. The very next sentence is when the court says, and that is why there's an intelligible principle. So I think the cases can easily work together, Your Honor. The fact that NCTA focuses on revenue-raising and says that an agency can't just raise revenue on public policy and public interest, and Skinner's readoption of that.